IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ABRAHAM GUTMANN, and
THE GREEN PARTY OF NEW MEXICO,

      Plaintiffs,

    v.                                              No. CIV 96-1513 MV/RLP

DENNIS E. CAMPBELL, Individually and in
his official capacity as Manager of the New Mexico
State Fair; and TRAVIS EDEN, BLAKE CURTIS,
D'AUNA WOOD, CONNIE TSOSIE GAUSSOIN,
BILL McILHANEY, NED SHEPERD and E. PHIL
HARVEY, JR., Individually and in their official capacities
as members of the STATE FAIR COMMISSION; and
THE NEW MEXICO STATE FAIR COMMISSION; and
NEW MEXICO STATE FAIR,  a body corporate,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court upon the following motions: Defendants'

Motion to Dismiss All Claims for Damages Against Defendants New Mexico State Fair

Commission and New Mexico State Fair and Against the Individual Defendant Commissioners

filed January 10, 1997 **[Doc. No. 15]**; Defendants' Motion for Summary Judgment on the

Grounds of Quasi-Legislative and Qualified Immunity filed July 17, 1997 **[Doc. No. 59]**;

Plaintiffs' Motion for Summary Judgment filed October 15, 1997 **[Doc. No. 80]**; Defendants'

Motion for Partial Summary Judgment on Plaintiffs' Claim for Equitable Relief filed December

18, 1997 **[Doc. No. 107]**; and Defendants' Motion for Summary Judgment on the Issue of

Damages filed December 18, 1997 [**Doc. No. 111**].  Having considered the parties' briefs, supplemental authority, and being otherwise well-informed, the Court rules upon the motions herein.

## FACTUAL BACKGROUND

Abraham Gutmann, a Green Party candidate for the United States Senate, entered the New Mexico State Fair on September 20, 1996 and began speaking with State Fair visitors and handing out literature about his candidacy.  Mr. Gutmann was soon informed that his conduct was prohibited by State Fair rules and policies.[1]  State Fair Manager Dennis Campbell directed Gutmann to either cease his activities or be subject to removal from the fairgrounds by the New Mexico State Police.  Mr. Gutmann continued his campaigning efforts on the fairgrounds and was subsequently escorted out of the Fair and arrested by New Mexico State Police.

Abraham Gutmann, along with the Green Party of New Mexico, thereafter filed this action against the New Mexico State Fair, the State Fair Commission, the State Fair Commissioners, and the State Fair Manager, claiming that Defendants' acts which prevented Plaintiffs from engaging in certain forms of political speech during the New Mexico State Fair and Defendants' acts which subjected Plaintiff Gutmann to arrest by the New Mexico State Police violated Plaintiffs rights under the United States Constitution.  Gutmann and the Green Party further requested an injunction to prevent enforcement of the rules and policies and a declaration that the speech-restricting policies violate the Constitution.

---

[1] Although substantial confusion continues to exist regarding which of the Fair's rules and policies were violated by Gutmann, it appears that four rules and policies banned at least some of Gutmann's activities: An August 30, 1996 policy issued by Fair Manager Dennis Campbell, a April 10, 1996 policy issued by Mr. Campbell, State Fair Rule 17, and a long-standing, never-written general Fair policy.

Defendants New Mexico State Fair, State Fair Commission, and Defendant Commissioners soon filed a motion to dismiss all claims for damages on the grounds of Eleventh Amendment immunity and failure to state a claim against the Commissioners in their individual capacities.  Defendants next filed a motion for summary judgment on the grounds of quasi-legislative and qualified immunity.  Plaintiffs followed with a motion for summary adjudication of the constitutionality of the State Fair policies and the unavailability of a qualified immunity defense.  Defendants thereafter filed motions for summary judgment on Plaintiffs' equitable claim and summary adjudication of the issue of damages.

## DISCUSSION

### I.  Motion to Dismiss Claims Against Commissioners in Their Individual Capacity

The Court begins with Defendants' assertion that Plaintiffs have failed to allege sufficient facts to state a cause of action against the Fair Commissioners in their individual capacities.

To establish liability in a § 1983 action against a public official in his/her individual capacity, it is enough to show that the official, acting under color of state law, subjected or caused the complainant to be subjected to a deprivation of a right secured by the Constitution and laws. *Rizzo v. Goode*, 423 U.S. 362 (1976).  Accordingly, demonstrating an affirmative link between the conduct of the officer and the alleged deprivation is sufficient to impose § 1983 liability.  *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990); *Gates v. Unified Sch. Dist.*, 996 F.2d 1035, 1042 (10th Cir. 1993) (citing *Parratt v. Taylor*, 451 U.S. 527 (1981)) ("a claim seeking personal liability in a civil rights suit must be predicated on the defendant actor's personal involvement; there must be an affirmative link to causally connect the actor with the alleged violation.").  As noted by the Second Circuit, a defendant has sufficient involvement in a constitutional violation if

3

he/she directly participates in the conduct causing the deprivation, fails to remedy the alleged

wrong after learning of it, creates a policy or custom under which the unconstitutional practices

occur, or is grossly negligent in managing subordinates.  *Wright v. Smith*, 21 F.3d 496, 501 (2nd

Cir. 1994).

The gravamen of Plaintiffs' Complaint against the individual Commissioners is that

policies authorized by the State Fair Commissioners caused Plaintiff Gutmann to be prevented

from engaging in certain forms of campaigning and subjected Plaintiff Gutmann to arrest by the

New Mexico State Police.  Plaintiffs allege that the Commissioners "authorized, approved,

directed, or ratified the promulgation of the policy...as well as its application and enforcement by

Defendant Campbell against Plaintiff Gutmann."  According to Plaintiffs' allegations, therefore, it

is clear that the Commissioners' promulgation of the policies limiting political speech caused the

cessation of Gutmann's campaigning efforts and their implicit approval of the arrest of persons

like Gutmann caused Gutmann to be subject to the arrest.  Although the Commissioners may not

have been present when the arrest occurred, may not have known of the arrest, and may not have

specifically authorized the arrest, according to Plaintiffs' allegations, the arrest occurred pursuant

to the Commissioners' policies.  As Plaintiffs allege that the arrest occurred under policies created

or authorized by the Commissioners,[2] Plaintiffs need not allege that the Commissioners

_____

   [2] Unlike a § 1983 claim against a local governmental entity where the mere existence of a
policy which caused a constitutional violation is sufficient to incur liability, *Monell v. New York
Department of Social Service,* 436 U.S. 658 (1978), in a § 1983 claim against individuals for
adopting a policy that caused a constitutional violation, plaintiffs must demonstrate each
individual defendant's responsibility for the policy.  Consequently, Plaintiffs may not merely rely
on evidence that the Commissioners as a group created or authorized the State Fair rules and
policies; instead, Plaintiffs must adduce evidence of each individual Commissioner's involvement
with the rule and policies.

participated in or knew of the arrest.  The Court finds that an affirmative link exists between the

Commissioners' alleged conduct in adopting and ratifying the rules and policies and the alleged

violation of Plaintiffs' constitutional rights.  Accordingly, the Commissioners' motion to dismiss

the claims against them in their individual capacities is denied.[3]

II. Constitutionality of Rules and Policies

The Court next turns to Plaintiffs' motion for summary judgment.  By this motion,

Plaintiffs explicitly challenge the constitutionality of the State Fair's August 30, 1996 policy and

implicitly challenge the remainder of Defendants' rules and policies limiting political speech on the

fairgrounds: State Fair Rule 17, the State Fair's April 10, 1996 policy, and the State Fair's long-

standing, never-written "booth bound" policy.  In sum, Plaintiffs assert that the rules and policies

regulating the distribution of materials and dissemination of information at the New Mexico State

Fair[4] impermissibly infringe upon Plaintiffs' First Amendment rights and are facially

unconstitutional.

Generally, the First Amendment protects the right to communicate the type of political

speech Plaintiffs were attempting to express at the State Fair.  *Monitor Patriot Co. v. Roy*, 401

U.S. 265, 272 (1971) ("It can hardly be doubted that the [First Amendment] constitutional

guarantee has its fullest and most urgent application precisely to the conduct of campaigns for

---

[3] The Court notes that in the context of this motion to dismiss, the Court need only examine Plaintiffs' *allegations* regarding Defendant Commissioners' involvement in the arrest of Gutmann. Below, when Defendants raise this issue again in the context of their motion for summary judgment on the issue of damages, the Court examines the *evidence* presented regarding Defendant Commissioners involvement in Gutmann's arrest.

[4] Although the rules and policies challenged by Plaintiffs were supplanted by a new policy adopted on July 30, 1997, Plaintiffs' Motion, Ex. 11, the Commissioners subsequently repealed the new policy, leaving in effect the policy under which Gutmann was arrested.

political office."); *Schenck v. Pro-Choice Network of Western New York*, 117 S. Ct. 855, 867 (1997) (noting that leafleting on matters of public concern is a classic form of speech that lies at the heart of the First Amendment).   The First Amendment, however, "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). Consequently, some limitations on speech are permitted and the Supreme Court has developed a "forum-based" approach to assessing the constitutionality of governmental restrictions on speech. *International Society for Krishna Consciousness, Inc.* v. *Lee*, 505 U.S. 672, 678 (1992).  The Supreme Court recognizes three basic types of forums in the context of speech restrictions:  (1) public forums, property that has traditionally been available for public expression; (2) limited or designated public forums, property the state has opened for expressive activity by part or all of the public; and (3) nonpublic forums, property which is not by tradition or designation a forum for public communication.  *Perry Ed. Assn. v. Perry Local Educators' Assn.*,  460 U.S. 37, 45-46 (1983).

A state fair is generally considered a limited public forum, "in that it exists to provide a means for a great number of exhibitors temporarily to present their products or views, be they commercial, religious, or political, to a large number of people in an efficient fashion."  *Heffron*, 452 U.S. at 655.  A state is not required to retain indefinitely the open character of a limited public forum; however, as long as it does, the state may enforce regulations of the time, place, and manner of expression only if they are content-neutral, are narrowly tailored to serve a significant

government interest,[5] and leave open ample alternative channels of communication.  *Perry*, 460

U.S. at 46 (citing *Widmar v. Vincent*, 454 U.S. 263, 269-270 (1981)).  The Supreme Court has

repeatedly emphasized that the most critical aspect of a valid time, place, or manner restriction is

that it not be "based upon either the content or subject matter of speech."  *Consolidated Edison*

*Company of New York v. Public Service Commission of New York*, 447 U.S. 530, 536 (1980);

*Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) ("[A]bove all else, the First

Amendment means that government has no power to restrict expression because of its message,

its ideas, its subject matter, or its content.").

        The parties do not dispute that the State Fair policies and rules create place and manner

restrictions on speech.  First, State Fair Rule 17 restricts the posting of advertising, displaying of

political advertising, and the disseminating of political propaganda:  "Advertising by exhibitors by

means of posters, handbills, or signs on buildings, trees, posts, or other places on the Fairgrounds

is not allowed.  No exhibitor or concessionaire shall display any form of political advertising or

disseminate political propaganda unless his or her individual contract permits such a privilege."

State Fair Rule 17.  Second, the State Fair's April 10, 1996 policy limits the distribution of

printed and written material:  "It is the policy of the State Fair that collateral materials, (coupons,

flyers, brochures) may only be distributed from contracted exhibit/concession space during the

---

        [5] The Supreme Court has used a number of different terms to describe the nature of the
governmental interest that must be shown.  For example, in *Heffron*, the Supreme Court states
that the government must demonstrate a "significant" interest before restricting speech and in *Lee*,
the Supreme Court states that the interest must be "compelling."  It appears, however, that the
semantic inconsistency has not created substantively different standards.  "To characterize the
quality of the governmental interest which must appear, the Court has employed a variety of
descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong."  *United*
*States v. O'Brien*, 391 U.S. 367, 376 (1968).

annual event as outlined in concession/exhibit guidelines.  No individual or business shall be permitted to distribute such collateral materials without having such contracted space...."  April 10, 1996 Policy.  Third, the August 30, 1996 policy limits political advertising, distribution of political propaganda, and political endorsements:  "Any form of political advertising or dissemination of any political propaganda shall not be permitted except from a contracted space where that privilege has been granted.  Any political endorsements and/or political statements shall not be permitted on any Public Address systems [sic] and fair stages [sic]."  August 30, 1996 Policy.  Fourth, the State Fair asserts that it has a long-standing policy that no person shall disseminate literature or any other item other than from a rented booth space ("booth bound policy").  Eden Depo. at 16-17; Humphries Aff. ¶¶ 3, 12.

   a.  Governmental Interest

   The Court first examines the Defendants' asserted significant governmental interests in restricting the speech of fairgoers and exhibitors.  Defendants present two basic interests in maintaining the restrictions and limitations created by the rules and policies: crowd and litter control.[6]

---

[6] Defendants note, in passing, a third interest: protection of the procedure and revenue from concession rentals.  Reply at 2; Humphries Affidavit at 5.  Defendants, however, present no evidence regarding how these interests are furthered by the restrictions.  Nor is there any indication that the removal or narrowing of the speech restrictions would disrupt the booth rental procedure or decrease booth rentals.

i.  Crowd Control

First, the Defendants argue that the restrictions significantly further their interest in controlling and maintaining orderly movement of the large crowds attending the Fair. Defendant's Response, Ex. C.  The Supreme Court has previously found that a state had a substantial interest in the orderly movement and control of the large crowds at a state fair. *Heffron.*, 452 U.S., at 650.[7]  That interest, the Supreme Court found, was sufficient to justify "confining distribution, selling, and fund solicitation activities to fixed locations."  *Id.*, at 654.

In this case, New Mexico has a similar interest in crowd control at the State Fair;[8] however, the State Fair rules and policies challenged here do not purport to control distribution, selling, and solicitation activities.  Instead, the rules merely limit distribution activities.  As noted by the Supreme Court, there is a significant difference between leafleting and solicitation in the context of crowd control and movement.  "Solicitation impedes the normal flow of traffic [because] it requires action by those who would respond."  *United States v. Kokinda*, 497 U.S. 720, 733-34 (1990).  On the other hand, "[t]he distribution of literature does not require that the

---

[7] The Minnesota State Fair, which the Supreme Court examined in *Heffron* had an average daily attendance of 115,00 persons on weekdays and 160,000 persons on weekends.  *Heffron*, 452 U.S. at 643.  The Minnesota fairgrounds covered "125 acres, the bulk of which [was] covered by permanent buildings, temporary structures, parking lots, and connecting thoroughfares."  *Id.*, at 650.  In 1996, the New Mexico State Fair had an average weekday attendance of 92,000 and weekend attendance of 123,00.  Defendants' Response, Ex. C.  The New Mexico fairgrounds covers approximately 240 acres with only 80 acres used as a general traffic area where the public may circulate freely.  *Id.*

[8] The similarities in relevant characteristics and functions between the Minnesota State Fair and the New Mexico State Fair essentially mandate the conclusion that they have similar interests. *Heffron*, 452 U.S. at 650-651 (when assessing an asserted governmental interest, "consideration of a forum's special attributes is relevant...since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved.").

9

recipient stop in order to receive the message the speaker wishes to convey; instead the recipient is free to read the message at a later time." *Id.*, at 734.  Recognizing that distinction, the Supreme Court upheld a ban of solicitation of funds within New York airport terminals but struck down the ban on the repetitive distribution of printed or written materials in the airports.  *Lee*, 505 U.S. 672 and 505 U.S. 830.[9]

The Court finds that the distinction between distribution of materials and distribution of materials coupled with solicitation applies with equal force in the context of crowd control and movement at the New Mexico State Fair.[10]  As stated by Justice Blackmun in the context of a state fair, "common-sense differences between literature distribution on the one hand, and solicitation and sales, on the other, suggest that the latter activities present greater crowd control problems than the former."  *Heffron*, 452 U.S. at 665 (Blackmun, J., concurring in part, dissenting, in part).  In addition, Defendants' claim that leafleting will create additional crowd control problems is undermined by Defendants' own assertion that persons can "walk around the fairgrounds campaigning, glad-handing, backslapping and generally walking around soliciting

---

[9] Notably, in *Lee*, the Court found that the Airport was a nonpublic forum; consequently the restriction on speech merely had to be "consistent with the government's legitimate interest in preserving the property for the use to which it is lawfully dedicated."  *Id.*, at 687 (O'Connor, J. concurring in judgment).

[10] Throughout their briefs on the motions in this case, Defendants argue that *Heffron* dictates the outcome of this case and that the Court's analysis should be limited to applying *Heffron*. *Heffron*, however, did not purport to analyze the different individual effects of leafleting, selling, and solicitation.  Because the challenged State Fair's regulations only prohibit distribution and dissemination of information, the precedential value of *Heffron* is partially limited.  Accordingly, the court concludes that both *Heffron*, which discusses the particular needs for speech restrictions at a state fair, and *Lee*, which discusses the particular effects of distribution and dissemination of printed material in large crowds, are relevant to this Court's analysis of the New Mexico State Fair's speech restrictions.

votes." Defendants' Response at 6. Such permissible detaining of fairgoers in attempts to express one's message carries the same crowd control concerns as permitting peripatetic distributors of literature. As noted by Justice Brennan, "[i]f fairgoers can make speeches, engage in face-to-face proselytizing, and buttonhole prospective supporters, they can surely distribute literature to members of their audience without significantly adding to the State's asserted crowd control problem." *Heffron* 452 U.S. at 661 (Brennan, J., concurring in part, dissenting, in part).

The Court similarly concludes that in the absence of solicitation or selling, distribution of literature does not create greater crowd control problems than the oral campaigning and proselytizing the Fair asserts it permits. For the above-stated reasons, the Court finds that the Fair's ban on distribution of literature does not further its substantial interest in controlling and maintaining orderly movement of the crowds of fairgoers.

### ii. Litter

Defendants next argue that they have a substantial interest in controlling litter at the State Fair. Considering the density of people at the Fair, the substantial amount of potential litter, and the aesthetic blight caused by litter, the Court agrees that the state has a substantial interest in limiting the amount of litter at the State Fair.

It is not readily apparent how limiting the distribution of materials to particular locations on the fairgrounds will reduce the amount of trash. If a fairgoer is inclined to throw a pamphlet or brochure to the ground he/she will likely do so whether the document is picked up from a booth or from a wandering distributor. Notably, Defendants' statements make clear that it is unlikely that less literature would be distributed if all distributors were confined to booths. First, all interested in leafleting may rent booth space. Defendants' Response at 11 ("...if a person

11

desires to rent a booth space, they may do so virtually without limitation.").  Second, the Fair

asserts that it sets no limits on the amount of literature that may be passed out at a booth.

Defendants' Response at 14.  ("The Plaintiffs can rent a booth and pass out as much literature as

they desire.").  Of course, by having each booth exhibitor describe the nature of his/her activities

Fair personnel would be able to assess the potential amount of litter created by each booth, and

when the amount of potential litter exceeded the Fair's ability to remove it, the Fair could stop

renting booth spaces to exhibitors or limit their literature distribution.  Fair personnel could

achieve the same goal of limiting the total amount of potential litter by permitting itinerant

leafleting, but requiring all leafleters to register with the fair.  When the number of leafleters

exceeded the Fair's capability to cleanup, additional leafleting could be restricted.

 Not only have Defendants failed to describe how their speech-restricting rules and policies

diminish the amount of litter, but Defendants have also failed to demonstrate why other, less-

intrusive policies could not effectively control the feared litter.  As noted above, regulations that

restrict a substantial degree of expressive activity must be narrowly tailored to achieve a

governmental interest.  In the context of time, place, and manner restrictions, "[t]he requirement

of narrow tailoring is satisfied "so long as the...regulation promotes a substantial government

interest that would be achieved less effectively absent the regulation."  *Ward v. Rock Against

Racism*, 491 U.S. 781, 799 (1989).[11]  Banning leafleting is clearly not the sole effective method of

---

[11] Of course if the Court finds that the rules and policies are not content-neutral, Defendants
would have to meet the most exacting scrutiny of the rules and policies by demonstrating that they
are the least restrictive available means of achieving the compelling governmental interest.  *Ward*,
461 U.S. at 800 n.6 (quoting *Boos v. Barry*, 485 U.S. 312 (1988) which supports the conclusion
that a content-based regulation is neither precisely drawn nor 'narrowly tailored' if less intrusive
means than those employed are available).

controlling the litter leafleting might create.  As recognized by the Supreme Court as early as 1939, entities concerned with the control of litter are free to pursue other methods, such as punishing those who actually throw the papers on the streets.  *Schneider v. State (Town of Irvington)*, 308 U.S. 147, 162 (1939) (invalidating ban on handbill distribution on public streets); *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808 (1984) (noting that "[i]t is true that the esthetic interest in preventing the kind of litter that may result from the distribution of leaflets on the public streets and sidewalks cannot support a prophylactic prohibition against the citizen's exercise of that method of expressing his views.").  As concisely stated by a panel of the Fifth Circuit in the context of a university's—also a limited public forum—restrictions on the distribution of free newspapers:  "if the University wishes to prevent litter, it should prohibit littering."  *Hays County Guardian v. Supple*, 969 F.2d 111, 119 (5th Cir. 1992).  Here, the conduct that damages the State Fair's interests is littering, not leafleting.  In this context, where the harmful conduct can be effectively regulated, restricting the expressive activity whose by-product may interfere with the governmental interest is an overly intrusive method of achieving the interest.  *See Taxpayers for Vincent*, 466 U.S. at 810.  Defendants present no evidence that would permit this Court to conclude that Defendants' interest in preventing litter would be less effectively achieved by establishing and enforcing anti-littering policies.

Notably, in *Lee*, where Justice O'Connor noted, yet implicitly rejected, the asserted interest of avoiding litter as a significant interest substantially furthered by the ban on leafleting, *Lee*, 505 U.S. at 690, 692 (citing *Schneider*, 308 U.S. at 162), the regulation banned "continuous or repetitive distribution of printed or written material."  In this case the rules and policies ban distribution of *any* amount of printed or written material.  As noted by Defendant Travis Eden, if

13

Senator Domenici handed out a sheet of paper describing his position on the budget, he would be in violation of the Fair policies and if he refused to desist he would be escorted off the fairgrounds.  Eden Depo. at 53-54.  Clearly Senator Domenici's distribution of one or two one-page position papers to fairgoers would have no cognizable effect on the amount of trash at the Fair.  A regulation that banned repetitive or continuous distribution, like the regulation addressed in *Lee*, would reduce litter at the State Fair as effectively as the present policy but in a substantially less-intrusive manner.[12]

The Court finds that the Fair's restrictions on leafleting are not narrowly tailored to the asserted interest of controlling litter.  First, Defendants fail to describe how limiting leafleting to booths would decrease the amount or possibility of litter.  Second, any control that the "booth bound" policy gives fair personnel in their ability to cap the amount of litter could be as effectively achieved through a registration system for peripatetic leafleters.  Third, the Fair's goal of controlling litter could be as, or more, effectively achieved through the adoption and effective enforcement of anti-littering policies or through a less-intrusive regulation, such as one that prohibits repetitive distribution.

---

[12] The Court provides this example merely to demonstrate that less-intrusive, yet as effective, means of reducing litter are possible and by no means implies that it would find such a regulation to be constitutional in this context.

14

iii.  Conclusion

The Court concludes, therefore, that the regulations, even read in the light most favorable to Defendants, are not narrowly tailored to serve a significant government interest.[13]  Although this finding alone is sufficient to conclude that the regulations are facially unconstitutional, the Court will, for the sake of providing clarity and guidance, examine whether the regulations meet the other requirements of a permissible restriction on constitutionally protected speech.

b.  Alternative Channels of Expression

Restrictions on speech must leave open ample alternative avenues of expression for persons wishing to communicate their views.  In this case, Defendants assert that despite the restrictions on speech, the State Fair preserves three basic alternative means of communication: (1) walking around the Fair and orally expressing views; (2) renting a booth and dispensing oral and written forms of expression; and (3) distributing literature outside the fairgrounds.

i.  Oral Expression

It appears that the State Fair rules and policies preserve oral expression as a viable communication alternative, as long as the content of the expression is not political.  As Rule 17 and the August 30 policy make clear, no exhibitor, concessionaire, or fairgoer may disseminate any political propaganda except from a contracted space where that privilege has been granted.

---

[13]  The Court notes that the Fair's rules and policies come closest to furthering the goals asserted by Defendants insofar as the regulations prohibit leafleting.  To the extent the rules and policies restrict other expressive activities, such as posting of advertisements, displaying political advertising, disseminating political propaganda in other than documentary forms, political endorsements, and political statements, the rules and policies do not even plausibly advance the governmental interests of crowd and litter control.  Consequently, a corollary to the Court's conclusion that a ban on leafleting is not narrowly tailored to achieve an asserted governmental interest is that the other aspects of the regulations also fail to promote the asserted governmental interests.

Propaganda describes information spread to either help or harm a person, group, institution, movement, nation, etc., with no limitation on the form by which the information is presented. *See, e.g.* Webster's Third New International Dictionary.  Consequently, a ban on the dissemination of political propaganda covers oral political expression.  A further restriction on oral expression of political viewpoints at the Fair is the August 30 policy's ban on political endorsements or verbal political statements over the public address system or on the fair stages. The Court finds that the limitations on oral political communication created by the plain language of Rule 17 and the August 30 policy preclude oral expression within the fairgrounds as a viable alternative avenue of expression for persons wishing to communicate a political viewpoint.

ii.  Booth Expression

Plaintiffs also argue that renting a booth space is not a viable expression alternative, noting that the use of booth spaces for expressive purposes is not available without limitation.  The booth application manual states that "no product or service will be offered to the fairgoer that is detrimental to the health morals of the public."  Plaintiffs' Opp. Ex. 7.  Similarly, the booth contract contains a condition that "[a]ny activity, oral or visual advertising, solicitation and distributed material must be in good taste, must be neutral or positive in nature and may not be defamatory, derogatory, profane or vulgar.  Concessionaire and Exhibitor agrees to promote his or her own product and activity and refrain from discrediting a competing enterprise."  Plaintiffs' Opp. Ex. 8.

16

These restrictions on the uses of booth spaces have a substantial potential of narrowing the permissible speech expressed through this alternative channel of communication. For example, by the explicit language of the restrictions, a political candidate may be prevented from passing out literature criticizing his/her opponent. In addition, by permitting Fair personnel to preclude materials and exhibits that are not in "good taste, neutral, or positive," the standards create nearly unbridled discretion for Fair personnel to exclude those viewpoints with which they disagree. The Supreme Court has long looked with disfavor upon and invalidated speech restrictions that incorporate vague, imprecise and broad standards. *See, e.g., Gooding v. Wilson*, 405 U.S. 518 (1972) (statute prohibiting opprobrious or abusive language unconstitutionally overbroad). *Smith v. Goguen*, 415 U.S. 566, 572-73 (1974) (noting that the vagueness doctrine is designed to prevent "arbitrary and discriminatory" enforcement). "[W]ithout standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." *City of Lakewood v. Plain Dealer Publishing Company*, 486 U.S. 750, 763 (1988) (citing *Cox v. Louisiana*, 379 U.S. 536, 557 (1965)).

In this case, the evidence demonstrates that the broad discretion granted Fair personnel to control certain types of expression not only permits arbitrary exclusion of certain expression, but that Fair personnel may actually use the discretion to exclude constitutionally-protected speech. To illuminate the need for Fair personnel to retain discretion to restrict speech at booths, Defendants state "[f]or example, the expressive tactics involved in the 'right to life-abortion' debate are well known and some of those tactics would be unacceptable and inappropriate at a state fair." Defendants cite *Cannon v. City & County of Denver*, 998 F.2d 867 (10th Cir. 1993)

17

to detail the types of tactics used in the abortion debate; however that case merely demonstrates that the Tenth Circuit found that the abortion protesters had a constitutional right to engage in the challenged tactics. *Id.*, at 874.

The Court finds, therefore, that the nearly limitless discretion given and likely to be used by fair personnel to exclude expression they deem "inappropriate or unacceptable" precludes the booth system from being a reasonable alternative means of communication.[14]

iii.  Outside Fair Expression

Defendants finally assert that those wanting to engage in expression in means prohibited by the Fair can always do so on the streets outside the Fair.  It is clear, however, that such expression would not achieve the goal of persons wishing to express their ideas at the Fair.  As recognized by the Supreme Court, fairs provide "a means for a great number of exhibitors temporarily to present their products or views." *Heffron*, 452 U.S. at 655.  A speaker simply could not reach as large or dense of an audience if he/she were forced to present his/her views as fair patrons headed for fair entrances.  The substantial difference in the characteristics and expectations of the audiences inside and outside fairgrounds excludes the streets surrounding the grounds from being a reasonable alternative means of communicating a message prohibited inside the fairgrounds.

The Court concludes, therefore, that the State Fair does not provide, nor are there otherwise available, ample alternative channels of communication.

---

[14] This conclusion eliminates the need to address Plaintiffs' argument that excessive booth fees preclude the booth system from being an alternative means of communication.

c.  Content-Neutrality of the Restriction

Finally, the Court examines whether the State Fair rules and policies restrict speech in a content-neutral fashion.  Defendants argue that while standing alone Rule 17 and the August 30 policy may appear to draw a distinction between political and other types of speech, when read together, the State Fair rules and policies restricting speech simply prevent certain types of expressive behavior by all persons, regardless of subject matter.  The Court agrees, insofar as the rules and policies prevent the distribution of collateral materials.  It is clear from the April 10 policy and the fair personnel's understanding and implementation of the policy[15] that no person may distribute materials outside of a booth.  *See, e.g.,* Eden Depo. at 59, 69-70.  Consequently, the Court concludes that the Fair policies describe a content-neutral ban on the distribution of written and printed materials.  Plaintiffs present evidence, however, that Defendants have applied this ban on leafleting in an ad hoc and discriminatory manner.  Plaintiffs' Resp. at 16-17 (citing evidence of numerous examples of fair personnel permitting political candidates to leaflet during the State Fair).  This evidence is sufficient to permit a reasonable trier of fact to conclude that the leafleting ban has not been applied in a viewpoint-neutral manner.  Consequently, although facially neutral, the Court cannot conclude as a matter of law that the Fair policies against leafleting are applied in a content- or viewpoint-neutral manner.

Furthermore, when the subject matter is politics, the State Fair maintains extra restrictions beyond merely banning leafleting.  By Defendants' own definition of Rule 17, exhibitors and

---

[15] Administrative interpretation and implementation of a regulation are highly relevant to the analysis, for "[i]n evaluating a facial challenge to a state law, a federal court must ... consider any limiting construction that a state court or enforcement agency has proffered." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, n.5 (1982).

concessionaires are precluded from distributing or promoting political information or ideas. Defendants Reply at 4.  Such a ban includes conduct such as oral advocacy of a candidate or group's position or ideas.[16]  No similar, wide-sweeping ban of expression exists for other forms of speech such as oral commercial advertising or oral religious proselytizing.  In addition, the August 30, 1996, limitation on the use of the public address system and fair stages applies solely to political speech.  Finally, the Fair's ban on political displays is more restrictive than limitations on other types of displays.  *See* State Fair Rule 17.  For example, under the Fair's policies, a button reading "Vote for Domenici" would be impermissible, while buttons reading "Drink Coca-Cola" and "Read the Bible" would be permitted.

The Court concludes, therefore, that the State Fair's rules and policies describe content-based restrictions on political speech.  Defendants have presented no governmental interest that would justify this regulation of political speech.  The Court is compelled to find, therefore, that these restrictions fail the strict scrutiny applied to content-based regulation of constitutionally protected speech.  *See Boos v. Barry*, 485 U.S. 312 (1988).

d.  Conclusion

For the above-enumerated reasons, the Court finds that State Fair Rule 17, the State Fair policies issued on April 10 and August 30, 1996, and the State Fair's long-standing "booth bound" rule are not narrowly tailored to achieve an important governmental interest, fail to leave

---

[16] Defendant Eden asserts that political candidates could walk around the fairgrounds shaking hands and speaking with people.  While one-on-one political discussions may be permissible under the Fair policy, oral political advocacy of a sufficient number of people could be construed as the dissemination of political propaganda.  Defendant Eden, therefore, may be correct in the assertion that the Fair policies do not ban *all* oral political expression; however, it is clear that the policies permit the suppression of *some* oral political expression.

open ample avenues of alternative communication and otherwise unconstitutionally create special restrictions on political speech.  Accordingly, the Court concludes that the State Fair rules and policies restricting, on the State Fairgrounds, the (1) "display [of] any form of political advertising," (2) "disseminat[ion of] political propaganda," (3) distribution of "collateral materials," and (4) making of "political endorsements and/or political statements...on Public Address systems and fair stages" are unconstitutional on their face.[17]  Plaintiffs' motion for summary adjudication of the issue of the constitutionality of the Fair rules and policies is granted and Defendants' countermotion for summary judgment on Plaintiffs' equitable claim is denied.  Accordingly, the Court enters judgment in favor of Plaintiffs on their equitable claim.  An appropriate injunction will issue at the conclusion of this order.

## III.  Eleventh Amendment Immunity

Defendant State Fair and Defendants Commissioners and Campbell in their official capacities assert that they are entitled to Eleventh Amendment immunity from Plaintiffs' claims for damages.  The Eleventh Amendment shields States, absent their consent, from suit in federal court, "leaving parties with claims against a State to present them, if the State permits, in the

---

[17] Defendants argue that a ruling in favor of Plaintiffs' on their equitable claim would create an "impermissible constitutional imbalance that violates the Equal Protection Clause."  Defendants' assertion appears to rest on the assumption that granting Plaintiffs' such relief would favor political speech over religious speech because Judge Bratton recently vacated an injunction which had permitted members of the International Society for Krishna Consciousness to distribute literature and solicit donations.  *ISKCON v. N.M. State Fair*, Civ 77-698 HB (D.N.M. 1997).  Contrary to defendants' implied argument, Judge Bratton's decision did not adjudicate the constitutionality of the Fair polies as applied to religious speech; instead, Judge Bratton merely dissolved the injunction in the absence of any opposition by the plaintiffs.  The Court's finding that the Fair policies, on their face, unconstitutionally restrict speech invalidates the entirety of the Fair rules and policies.  Consequently, the State fair will be no more able to apply these speech restricting policies to religious groups than to political groups.

State's own tribunals." *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 39 (1994).[18]

Eleventh Amendment Immunity, therefore, extends only to the states and governmental entities

that are 'arms of the state.' *Watson v. University of Utah Med. Ctr.*, 75 F.3d 569, 574 (10th Cir.

1996); *Mascheroni v. Board of Regents of the University of California*, 28 F.3d 1554, 1559

(10th Cir. 1994) ("courts classify state governmental bodies according to a dichotomy, in which

arms of the state enjoy Eleventh Amendment immunity, whereas political subdivisions such as

counties and cities do not.").  Determining whether a particular public entity is an arm of the state

and thereby entitled to Eleventh Amendment immunity is inherently fact-specific and best taken on

a case-by-case basis.  *See Ambus v. Granite Board of Education*, 995 F.2d 992, 994 (10th Cir.

1993).

The Tenth Circuit has described several factors for courts to consider when faced with a

public entity claiming to be an arm of the state:  the characterization and definition of the entity in

its enabling and implementing legislation, state court interpretations and characterization of the

entity, the functions of the entity, the degree of local versus state control, the fiscal independence

of the entity, and the legal liability of the state for the entity's debts.  *Duke v. Grady Municipal

Schools*, 127 F.3d 972, 978- 980 (10th Cir. 1997); *Sonnenfeld v. City and County of Denver*, 100

F.3d 744, 749 (10th Cir. 1996).  Although all of these factors are relevant to the "arm of the

state" analysis, the most salient is the last:  the state's legal liability.  *Duke,* 127 F.3d at  980.

a.  Legal Characterizations

_____

[18] The Court notes that although Defendants only assert Eleventh Amendment immunity as to
Plaintiffs' claims for monetary damages, the Eleventh Amendment bars federal suits against states
and their agencies regardless of the relief sought.  *Pennhurst State School & Hospital v.
Halderman*, 465 U.S. 89, 100-1 (1982).  Consequently, the Court will examine Defendants'
asserted Eleventh Amendment immunity in relation to all of Plaintiffs' claims.

Although the first two factors, statutory and common-law characterizations of the State Fair, provide limited guidance, they both support a conclusion that the State Fair is not an arm of the state. First, like counties, municipalities, and other independent public entities, New Mexico law describes the State Fair as a "body politic and corporate and separate." N.M. Stat. Ann. § 16-6-14. Second, the New Mexico Supreme Court has made a passing reference to the Fair as a "separate governmental instrumentality." *Bober v. New Mexico State Fair*, 111 N.M. 644, 646, n.1 (1991).

b.  State Versus Local Control

Examination of the degree of state and local control of the State Fair reveals a relatively complex institutional arrangement, reflecting a tension between autonomy and oversight. The State Fair Commission has very broad powers to manage the fair. *Id.* §§ 16-6-4 (1997),[19]

_____

[19] The Commission's powers extend from complete rulemaking authority to control over the Fair's officers and employees:

> The commission, among other duties, shall prepare, adopt, publish and enforce all necessary rules for the management of the New Mexico state fair, its meetings and exhibitions and for the guidance of its officers, employees and exhibitors. The commission shall determine the duties, compensation and tenure of office of all of its officers and employees and may remove from office or discharge any person appointed or employed by it at will and shall have the power to appoint all necessary fairgrounds police to keep order on the grounds and in the buildings of the state fair. The fairgrounds police so appointed shall be vested with the same authority for such purposes as peace officers. The commission shall have the power to charge entrance fees and admissions and lease stalls, stand and restaurant sites, give prizes and premiums, arrange entertainments and do all things which by the commission may be considered proper for the conduct of the state fair not otherwise prohibited by law. The commission shall prohibit the sale or consumption of alcoholic beverages on the grounds of the state fair except in controlled access areas within the licensed premises. The commission or its designees shall meet with the director of the alcohol and gaming division of the department of regulation and licensing and other parties in interest to designate the controlled access areas on which the sale and consumption of alcoholic beverages may be permitted.

including the ability to acquire, possess, and dispose of property, and to build, improve, repair, or maintain "buildings, structures, improvements, grounds and equipment, which may be required or convenient for the purpose of operating a state fair." *Id.* § 16-6-15.  In addition, the State Fair controls its own buildings and lands. *Id.* §15-3-2.  The Fair can borrow money or issue up to six million dollars' worth of negotiable bonds. *Id*. §§ 16-6-15, 16-6-16.  Furthermore, no monies derived from the Fair need be deposited into state bank accounts; instead, the Fair must deposit its funds in separate accounts. *Id.* § 16-6-18; *compare Haldeman*, 32 F.3d at 473.  Finally, the Fair has the right of "suing and being sued [and] of contracting and being contracted with."  N.M. Stat. Ann. § 16-6-11. These statutory provisions demonstrate that the State Fair enjoys considerable autonomy.

Counterbalancing this independence are provisions granting substantial supervision to the state.  The Fair's Acting Director is a gubernatorial appointee to whom the State Fair Commission has temporarily delegated full authority to manage the Fair.  The governor appoints, with the advice and consent of the senate, all seven State Fair Commission members. *Id.* § 16-6-1.[20]  In addition to presenting an annual financial statement to the governor, N.M. Stat. Ann. § 16-6-6, the State Fair must "submit to the department of finance and administration for review a monthly budget status report, a list of all checks issued and supporting documentation for each expenditure." *Id.* § 16-6-3.1.  The Fair must obtain prior approval from the Board of Finance

---

N.M. Stat. Ann. § 16-6-4(B).

[20] This factor was influential in favoring immunity in *Watson*, 75 F.3d at 575.

before issuing bonds and negotiating or renegotiating loans.  *Id.* § 16-6-15.[21]  The Fair is subject

to various controls and approvals with respect to sales or leases of its real property.  *Id.* §§ 13-6-

2, 13-6-2.1, 13-6-3.[22]  Finally, New Mexico Department of Finance and Administration

Regulations govern State Fair expenditures.  *Id.* § 6-3-6.

     While the significant supervision by the State acts as a limitation on the State Fair's

independence, the Court finds, on balance, that the substantial autonomy that the Fair enjoys to

manage its own affairs tends to demonstrate that the State Fair is not an arm of the state.

c.  Financial Independence

     The State Fair generates substantial earnings on its own; however, the State continues to

provide financial support.  From 1991 to 1996, the Fair's operating revenues ranged from twelve

to fifteen million dollars each year.  Despite this independent income, the Fair has occasionally

received funds from the State of New Mexico.  In 1997 the State Board of Finance approved a

transfer of $500,000 to the State Fair Commission and extended the Fair an interest-free loan in

an amount not to exceed $392,698.65.  The Department of Public Safety forgave an indebtedness

of $127,970.92 that the Fair incurred in 1996.  According to the Fair's Accounting Manager, the

State of New Mexico is currently providing $400,000 to the Fair for capital projects.  The

Department of Tourism assists the Fair financially by paying the salary of its Acting Director.  For

---

[21] Compare with N.M. Stat. Ann. § 22-5-4(K) and § 22-18-1, allowing local school boards to issue general obligation bonds for capital improvements, unfettered by State Board of Finance approval.  The New Mexico Supreme Court in *Daddow v. Carlsbad Municipal School District*, 120 N.M. 97 (N.M. 1995), which the Tenth Circuit thought persuasive in *Duke*, 127 F.3d at 981, found that the power to issue bonds weighs heavily in favor of autonomy.  *Daddow*, 120 N.M. at 103.

[22] The Court notes that the New Mexico Supreme Court minimized the importance of this provision in its immunity analysis for *Daddow*, 120 N.M. at 104.

1993 and 1994, the Fair reports appropriations of $250,000 for each year as nonoperating revenues; however, Plaintiffs dispute those amounts as coming entirely from the State of New Mexico.

Although the Fair receives a significant amount of funding from the State, the Fair's considerable financial independence and ability to provide for its own financing supports the conclusion that the Fair is not an arm of the state.

   d.  State's Legal Liability

Finally, yet most importantly, the Court examines the State's legal liability for Fair debts.[23] Three statutory provisions are relevant to this question.  First, nothing in the New Mexico State Fair statutes "shall be construed to authorize New Mexico state fair [sic] to contract a debt on behalf of, or in any way obligate, the state of New Mexico."  N.M. Stat. Ann. § 16-6-20. Although the word "obligate" implies that the statutory provision solely insulates the State from the Fair's contractual debts, the Court finds it broad enough to eliminate the State's liability for all of the Fair's debts, including those arising from judgments for constitutional violations.  This reading of the statute is supported by the second relevant statute, N.M. Stat. Ann. § 16-6-11, which allows the Fair to be sued directly for, assumedly, any legal violation.  Third, the Court's decision is informed by the statutory provision stating that the State is not liable for any of the bonds the Fair issues.  N.M. Stat. Ann. § 16-6-21; *Sonnenfeld*, 100 F.3d at 749-50.  The Court

---

[23] While courts formerly conducted a practical analysis of the impact of a judgment on a state treasury as well as examined the legal liability of the State, *see, e.g. Hess*, 513 U.S. at 51, it is now clear that in the Tenth Circuit the State's legal liability is the only relevant consideration. "We interpret [*Regents of the University of California v. Doe*, 117 S. Ct. 900, 903 (1997)], to require us to focus on legal liability for a judgment rater than practical, or indirect, impact a judgment would have on a state's treasury."  *Duke*, 127 F.3d at 80.

concludes therefore that the State is not legally liable for the debts of the State Fair.

e. Conclusion

The factors to be considered when determining whether a public entity is an arm of the state, including the most salient factor of the state's legal liability, support the conclusion that the State Fair is not an arm of the State of New Mexico. Accordingly, the Court concludes that the State Fair is an independent political subdivision and therefore neither it nor its governing board is entitled to Eleventh Amendment immunity from suit in federal court.

IV. Quasi-Legislative Immunity

The individual Defendants assert that they cannot be held liable for any acts involving the promulgation and adoption of the policies and rules at issue in this case because they are entitled to quasi-legislative immunity. Originally, legislative immunity was afforded only to United States Congressmen under the Speech and Debate Clause of the Constitution, but the Supreme Court has since expanded the scope of the immunity to cover state legislators and state agencies and officials when exercising properly granted rulemaking authority. *See Supreme Court of Virginia v. Consumers Union of the United States,* 446 U.S. 719 (1980) (Virginia Supreme Court immune when exercising legislative authority); *Tenney v. Brandhove*, 341 U.S. 367 (1951) (finding that state legislators enjoy common-law immunity from liability for their legislative acts); *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 502-503 (1975) (discussing protections afforded Congress under the Speech and Debate Clause). In addition, legislative immunity has been held to apply to local governing bodies acting in a legislative capacity.[24] *Goldberg v. Town of Rocky Hill*,

[24] Notably, the Supreme Court has recently granted *cert* in a case which presents the question: Are individual members of a local legislative body entitled to absolute immunity from liability under 42 U.S.C. § 1983 for actions taken in a legislative capacity? *Bogan v. Scott-Harris*, 117 S.

973 F.2d 70, 72 (2nd Cir. 1992) (collecting cases); *Abraham v. Pekarski*, 728 F.2d 167, 174 (3rd Cir. 1984) (noting that subsidiary units of state governments exercising legislative powers cannot be sued for legislating).

The doctrine of absolute legislative immunity is based on the concept that legislators, when acting collectively to pursue a view of the public good through legislation, must be free to represent their constituents "without fear of outside interference" such as private lawsuits. *Biblia Abierta v. Banks*, 129 F.3d 899, 903 (7th Cir. 1997) (citing *Supreme Court of Virginia,* 446 U.S. at 731 (1980)). The threat of private lawsuits carries the danger of encouraging legislators to refrain from addressing thorny, controversial issues in order to avoid "not only...the consequences of litigation's results but also...the burden of defending themselves." *Consumers Union*, 446 U.S. at 732 (quoting *Dombrowski v. Eastland*, 387 U.S. 82 (1967)).

As the immunity is only designed to permit legislators to discharge their legislative duty freely, it follows that legislative immunity is available only where "the activities complained of [are] purely legislative." *Wood v. Strickland*, 420 U.S. 308 (1975). Furthermore, the Supreme Court has made clear that legislative immunity from liability is only intended to protect "lawful and appropriate" legislating. *Forrester v. White*, 484 U.S. 219, 223 (1988). ("To the extent that the threat of liability encourages these officials to carry out their duties in a lawful and appropriate manner, and to pay their victims when they do not, it accomplishes exactly what it should."). Recognizing these two principles, the Third Circuit has stated that the only actions that are protected by legislative immunity are those that are both "substantively" and "procedurally"

_____

Ct. 2430 (1997).

legislative.  *Acierno v. Cloutier*, 40 F.3d 597, 610 (3rd Cir. 1994).

As noted by the *Acierno* court, acts are substantively legislative if the conduct of the officials involves the enactment of new legislation or amendment of existing legislation; however, if the conduct simply involves enforcement of already existing laws, the acts are generally administrative or executive in nature.  *Id.,* at 611-12.  An additional factor to consider when distinguishing between substantively legislative and non-legislative acts is the action's impact on citizens:  those acts affecting the community-at-large are usually substantively legislative, while those directed at a few individuals are more often executive or administrative.  *Id.*  For an action to be procedurally legislative, it must proceed through the established legislative process; however, it need not conform precisely with every technical requirement for enacting law.  *Id.*, at 613-14 ("In making the determination of whether a particular action was procedurally legislative or not, the court need only be satisfied that the municipal body is acting pursuant to the basic legislative procedure.").

A legislator requesting immunity from suit bears the burden of establishing the applicability of legislative immunity.  *See, e.g.*, *Virgin Islands v. Lee*, 775 F.2d 514, 544 (3rd Cir. 1985).  Consequently, defendants must demonstrate that their promulgation and adoption of rules or policies are both substantively and procedurally legislative.  In this case, however, Plaintiffs solely challenge the procedural nature of Defendants' adoption of the policies at issue.  Plaintiffs argue that the adoption of Rule 17 and the August 30 and April 10 policies did not conform with the established procedures for law-making by the State Fair Board.  Defendants admit in their answers to Plaintiffs' interrogatories that none of the policies or rules at issue here "were formally approved or submitted for approval to the State Fair Commission.  There are no documents,

including minutes of board meetings, approving the policies...."  Answer to Interrog. 3, Second Supplemental Answers.[25]  It appears, therefore, that the State Fair's adoption of Rule 17 and the two policies did not follow any accepted legislative decision-making process.  As noted by Plaintiffs, the admissions by Defendants demonstrate that the rule and policies were issued without public notice, public comment, or public meeting.

As indicated above, the purpose of the requirement that acts protected by legislative immunity be procedurally legislative is to ensure that the act is a legitimate, reasoned decision representing the will of the people which the governing body has been chosen to serve.  *Ryan v. Burlington County, New Jersey*, 889 F.2d 1286, 1291 (3rd Cir. 1989).  In this case, the complete failure to adhere to the most basic constitutionally mandated procedures for enacting legislation clearly demonstrates that the actions of the Commission and Fair Manager in promulgating these rules and policies were not legitimate, reasoned decisions representing the will of the people.[26]  Consequently, the acts cannot be said to be procedurally legislative.  The Court finds, therefore, that Defendants' actions are not entitled to legislative immunity.

----

[25] Defendants later note that Rule 17 and the two policies merely implement a policy that had informally been in place at the State Fair since 1976.  Defendants continue to admit, however, that "there is no specific reflection in any State Fair records that could be found...that this policy had ever been formally adopted by the Commission."  Reply Summary Judgment Motion for Equitable Relief at 2.

[26] Unlike *Acierno*, this is not a case where the legislators merely violated a technical rule in their adoption of legislation; instead, it is a case where the legislators failed to follow the most basic of legislative procedure.

V.  Qualified Immunity

In the absence of absolute legislative immunity, the individual Defendants assert that they are entitled to qualified immunity from Plaintiffs' legal claims.  The Supreme Court has stated that governmental officials are entitled to qualified immunity from suit under § 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Consequently, once a public official raises a qualified immunity defense, the plaintiff bears the burden of coming forward "with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that that law was clearly established when the alleged violation occurred."  *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988).  Of course, if a plaintiff fails to demonstrate that a defendant's conduct violated the law, the court need not reach the issue of whether the law was clearly established.  *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993).

To carry the burden of demonstrating that a defendant has violated the law, a plaintiff must do more than merely identify, in the abstract, a clearly established right and allege that the defendant has violated it.  Rather, plaintiffs must describe, with specificity, the clearly established constitutional right and the defendant's conduct which allegedly violated the right.  Plaintiffs must then "demonstrate a 'substantial correspondence between the conduct in question and the prior law...establishing that the defendant's actions were clearly prohibited.'"  *Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995).  The plaintiff need not demonstrate that the defendant's actions precisely mirror the facts of the precedent setting case. *Garcia ex rel. Garcia v. Miera*, 817 F.2d 650, 657 (10th Cir. 1987).  Instead, "[f]or defendants to be liable the contours of an asserted right

31

must have been sufficiently clear that reasonable officials in their positions would understand that their actions would violate that right." *Yvonne L. v. N.M. Department of Human Services*, 959 F.2d 883, 891 (10th Cir. 1992).

In this case, as noted above, Plaintiffs have produced sufficient evidence for a trier of fact to find that Defendants maintained rules and policies that unconstitutionally restricted Plaintiffs' First Amendment rights of free speech and that Plaintiff Gutmann was arrested as a result of his alleged violation of the State Fair rules and policies addressed here. As described in more detail above, Plaintiffs have thereby sufficiently shown a substantial correspondence between Defendants Commissioners and Campbell's conduct in creating the unconstitutional policy and Plaintiff Gutmann's arrest. The Court finds, therefore, that the evidence presented by Plaintiffs is sufficient to find that Defendants' conduct violated the law.

As demonstrated by the precedent relied upon by the Court in discussing the constitutionality of the rules and policies and the liability for creating a policy under which a constitutional deprivation occurs, the contours of Plaintiffs' asserted rights were sufficiently clear at the time of the alleged violations that the State Fair officials would understand that their actions violated the law.

Accordingly, the Court finds that Defendants Commissioners in their individual capacities and Defendant Campbell are not entitled to qualified immunity from Plaintiffs' legal claims.

VI.  Claims for Damages

By their recent motion for summary adjudication, Defendants argue, on a number of grounds, that Plaintiffs are not entitled to damages for the claims they have raised in this action.

a. Individual Defendants' Liability for Damages

First, reviving their argument for dismissal of Plaintiffs' claims against the Fair Commissioners in their individual capacities and Defendant Campbell, Defendants argue that Plaintiffs' pleadings do not support an award of damages against defendants for acts conducted in their individual capacities because the evidence demonstrates that none of the Defendants arrested Mr. Gutmann.  As noted above, Plaintiffs need only show that the arrest occurred pursuant to an unconstitutional policy created or authorized by the Commissioners.  Consequently, the evidence adduced by Defendants tending to show that the Commissioners were not involved in the actual arrest of Mr. Gutmann is not necessarily relevant.[27]  On the other hand, evidence demonstrating that Defendants Commissioners did not create or authorize the policies at issue is very relevant. Defendants argue that the booth bound policy which precluded Mr. Gutmann's acts had been adopted long before the tenure of any of the Defendant Commissioners.  However, even if none of the Defendant Commissioners were the first to conceive of, or establish, these speech-restrictive policies, Plaintiffs have presented evidence that clearly indicates the Commissioners'

---

[27] Plaintiffs continue to argue that Defendants' "enforcement" of the Fair policies was the proximate cause of Mr. Gutmann's arrest.  Plaintiffs adduce, however, no evidence tending to show that the Defendant Commissioners were involved in the actual enforcement of the policy against Mr. Gutmann.  The Court concludes, therefore, that on the evidence presented, no trier of fact could find that an affirmative link exists between the Defendant Commissioners' enforcement of the policy and Mr. Gutmann's arrest.  On the other hand, the evidence presented by Plaintiffs regarding Defendant Campbell's role in requesting the removal of Mr. Gutmann from the fairgrounds is sufficient for a trier of fact to find an affirmative link between Defendant Campbell's enforcement of the policy and Mr. Gutmann's arrest.  Defendants emphasize that Defendant Campbell only requested that Officer Martin *remove* Gutmann from the fairgrounds and that Mr. Campbell never ordered, requested, or suggested that Gutmann be *arrested*.  While the Court recognizes Defendants' semantic emphasis, a reasonable jury could find that the natural consequence of Campbell's request that Gutmann be removed from the fairgrounds as a trespasser was Gutmann's eventual arrest for criminal trespass.

approval of the policies by consenting and acquiescing to the creation of Rule 17 and the April 10 and August 30 policies.  Plaintiffs also present substantial evidence of Defendant Campbell's involvement in the adoption and reaffirmance of the speech restrictive policies—Campbell was the author and signatory to the April 10 and August 30 policies.

Plaintiffs, therefore, have adduced sufficient evidence for a reasonable trier of fact to find that Plaintiff Gutmann was arrested pursuant to these policies which the Defendant Fair Commissioners and Defendant Campbell approved and maintained.  The Court reaffirms it conclusion, therefore, that proof regarding the Defendants' role in the adoption and maintenance of the policies may be sufficient to establish an affirmative link between the Fair Commissioners and Campbell's conduct and the arrest of Mr. Gutmann.  It follows, therefore, that Defendant Commissioners and Defendant Campbell may be liable in their individual capacities for Gutmann's injuries arising from his arrest.

b.  Damages From Arrest

Defendants next argue that Plaintiffs have failed to produce any evidence of damage caused by the arrest of Mr. Gutmann.  As noted by Plaintiffs, Mr. Gutmann has declared that he suffered emotional distress from being escorted from the fairgrounds, being arrested and incarcerated, and losing dignity and citizenship from the suppression of his First Amendment rights.  Even recognizing that all of the direct evidence of Plaintiffs' emotional distress damages comes from Plaintiff Gutmann's own testimony, the Court finds that Mr. Gutmann's assertions, in the context of other evidence regarding the circumstances of his arrest, are adequate for a reasonable trier of fact to find that Mr. Gutmann suffered emotional distress as a result of his

arrest.[28]

Defendants' assertion that Mr. Gutmann planned and insisted on being arrested does not undermine this conclusion.  As noted by the Supreme Court, purposefully engaging in acts that would subject an individual to arrest does not disqualify that individual from seeking damages under § 1983, especially where, as here, the purpose of engaging in the acts is to test the individual's rights under the Constitution.  *See Pierson v. Ray*, 386 U.S. 547 (modified on other grounds *Harlow*, 475 U.S. 800).

c.  Damages from Denial of First Amendment Rights

Defendants also assert that Plaintiffs cannot collect actual damages for the denial of their First Amendment rights because they will be unable to prove actual damages.  Plaintiffs respond by noting that in cases where a plaintiff seeks compensation for a constitutional injury that is likely to have occurred but difficult to establish, presumed damages are an appropriate substitute for ordinary compensatory damages.  *Memphis Community School District v. Stachura*, 477 U.S. 299, 310-11 (1986).  Where a plaintiff shows an actual compensable injury, presumed damages may substitute for proven compensatory damages.  *See id.*  Damages, however, should not be presumed to flow from every deprivation of a constitutional right.  *Carey v. Piphus*, 435 U.S. 247, 263 (1978).  Instead, presumed damages "may be recoverable when substantive constitutional rights, such as the right to freedom of speech, or the right to be free from

---

[28] Defendants also assert that Plaintiffs have failed to quantify any suffering by Mr. Gutmann. Defendants, however, fail to provide any authority for the proposition that a plaintiff making a claim for emotional distress damages must quantify those damages in order to survive a summary judgment motion.  The mere failure to quantify damages surely cannot preclude a plaintiff from presenting evidence to a jury regarding the injuries suffered and the amount of damage caused by those injuries.

unreasonable searches and seizures, are infringed." *Hessel v. O'Hearn*, 977 F.2d 299, 301 (7th Cir. 1992); *Domegan v. Ponte*, 972 F.2d 401, 418 n.31 (1st Cir. 1992) (collecting cases which permitted presumed damages for First Amendment violations); *Walje v. City of Winchester*, 827 F.2d 10, 13 (6th Cir. 1987) (noting that presumed damages are commonly granted in actions for common law speech torts).

In this case, Plaintiffs assert that they have been denied a substantive constitutional right involving the right to free speech and some of the injuries claimed by Plaintiffs are likely to have occurred but are difficult to establish. *Compare Spence v. Board of Education of Christina School District,* 806 F.2d 1198 (3rd Cir. 1986) (presumed damages not available for emotional distress caused by constitutional injury). For example, Plaintiffs allege that Defendants' adoption and enforcement of their unconstitutional policies prevented Plaintiffs from securing votes in the November 1996 election. Obviously it is difficult to identify how many more votes Mr. Gutmann and the Green Party may have received if they had been permitted to campaign at the State Fair. It is similarly difficult to quantify the damage to the candidate and party caused by receiving fewer votes than they would have received absent the constitutional violation.

The Court concludes, therefore, that Plaintiffs may be entitled to presumed damages; however, Plaintiffs also present evidence regarding damages that are not difficult to establish, such as the additional expenses caused by being unable to campaign at the State Fair. Gutmann Affidavit.[29] If Plaintiffs present evidence regarding the actual injury suffered by Plaintiffs from

---

[29] Plaintiffs also present evidence describing the damage to Mr. Gutmann's professional reputation and the Green Party as a result of the arrest of Plaintiff Gutmann. This evidence, however, does not rebut Defendants assertion that Plaintiffs cannot recover for the loss of the opportunity to exercise First Amendment rights; instead, it is relevant to damages caused by Gutmann's arrest.

their loss of opportunity to exercise their First Amendment rights, the Court may decline to submit the question of presumed damages to the trier of fact.  *See Trevino v. Gates*,  99 F.3d 911, 921 (9th Cir. 1996) (noting that "[a] presumed damage instruction is not required when, as in this case, 'the jury was fully authorized to compensate respondent for both monetary and nonmonetary harms caused by petitioners' conduct.'") (citing *Stachura*, 477 U.S.  at 312).[30]

c.  Punitive Damages

Defendants finally argue that Plaintiffs are not entitled to punitive damages.  Punitive damages in a § 1983 action are appropriate where the defendant's conduct is motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  Plaintiffs present evidence of several facts which they believe demonstrate the intent and indifference of Defendants Commissioners and Campbell.  Plaintiffs first note that on at least three occasions, Fair Commissioners have been notified of the unconstitutionality of the Fair policies:  (1) An August 1976 letter from the Attorney General's Office; (2) a 1978 injunction prohibiting the application of the policies against Hare Krishnas; and (3) a 1982 injunction invalidating a State Fair anti-leafleting policy. Defendants respond by noting that the 1976 letter pre-dated the clarification of the law in *Heffron*; that the acquiescence of the Fair to the 1978 injunction merely demonstrated the Fair's observations that the Krishnas had not caused trouble while practicing Sankritan; and that the 1982 injunction involved a policy substantially different from that presented here.  The Court

---

[30] Defendants' assertion that Plaintiffs are not entitled to nominal damages relies on the argument that Plaintiffs have not produced sufficient evidence to prove that a First Amendment violation has occurred.  The Court's rejection of Defendants' argument regarding evidence of a First Amendment violation mandates the denial of Defendants' claim that Plaintiffs are not entitled to nominal damages.  *See, e.g., Carey v. Piphus*, 435 U.S. 247 (1978).

37

agrees that the evidence presented by Plaintiffs is insufficient for a reasonable trier of fact to find that the notice to Defendants regarding the constitutionality of the Fair's speech restrictions demonstrates that Defendants intentionally adopted and maintained a policy they knew was unconstitutional.

Plaintiffs next assert that Defendants' statements reveal that they intentionally adopted the policies to target political speech. Plaintiff's Response at 16. The statements cited by Plaintiffs, however, actually demonstrate that the Commissioners being deposed believed that the policies constituted a content-neutral ban on the distribution of information. Plaintiffs' also present evidence tending to show that the policy has been enforced in a viewpoint-specific manner. Plaintiffs' Response at 17. Even if a trier of fact found that the policy was not enforced against political candidates with particular viewpoints, Plaintiffs have not presented evidence showing that Defendants Commissioners ordered or were aware of the application of the policy against Gutmann. Consequently, Defendants Commissioners cannot be found to have intentionally or indifferently enforced the policy against Mr. Gutmann. On the other hand, upon the evidence presented by Plaintiffs, a reasonable jury could find that Defendant Campbell was aware of the allegedly discriminatory application of the policy against Gutmann. It follows that a reasonable trier of fact could find that the active unconstitutional enforcement, or the intentional acquiescence in such enforcement, demonstrates that the alleged deprivation of Gutmann's constitutional rights by Defendant Campbell was motivated by evil motive or intent or callous or reckless indifference.

Plaintiffs finally note that Defendants Commissioners did nothing after the events giving rise to this litigation occurred. The Defendant Commissioners inaction following the arrest of Mr.

Gutmann does not demonstrate evil motive or callous indifference in their adoption and maintenance of the policy; instead, the Defendants actions merely indicate their belief that their policy was constitutional.

The Court finds, therefore, that a reasonable trier of fact could find for Plaintiffs on their prayer for punitive damages against Defendant Campbell.  Plaintiffs, however, have not produced sufficient evidence for a reasonable trier of fact to assess punitive damages against Defendants Fair Commissioners.  Accordingly, Plaintiffs' prayer for punitive damages against Defendants Commissioners is hereby stricken.

## CONCLUSION

**IT IS THEREFORE ORDERED** as follows:

1.  Defendants State Fair Commissioners' Motion to Dismiss Plaintiffs' Claims Against Them in Their Individual Capacities **[Doc. No. 15]** is **DENIED**.

2.   Plaintiffs' Motion for Summary Judgment on the Issue of the Constitutionality of the Fair Rules and Policies **[Doc. No. 80]** is **GRANTED**.  Accordingly, the Court enters judgment in favor of Plaintiffs on their equitable claim.  An appropriate injunction will issue below.

3.  Defendants' Motion for Summary Judgment on Plaintiffs' Equitable Claim **[Doc. No. 107]** is **DENIED**.

4.  Defendants State Fair and State Fair Commissioners and Manager in Their Official Capacities' Motion to Dismiss on Grounds of Eleventh Amendment Immunity **[Doc. No. 15]** is **DENIED**.

5.  Defendants State Fair Commissioners' Motion for Summary Judgment on Grounds of Quasi-legislative Immunity **[Doc. No. 59]** is **DENIED**.

6.  Defendants State Fair Commissioners and Defendant Campbell in Their Individual Capacities' Motion for Summary Judgment on Grounds of Qualified Immunity **[Doc. No. 59]** is **DENIED**.

7.  Plaintiffs' Motion for Summary Adjudication Regarding Individual Defendants' Entitlement to Qualified Immunity **[Doc. No. 80]** is **GRANTED**.

8.  Defendants' Motion for Summary Adjudication on the Issue of Damages **[Doc. No. 111]** is

**DENIED** in all respects except Plaintiffs' prayer for punitive damages against Defendant Commissioners is **STRICKEN**.


## PERMANENT INJUNCTION

Accordingly, and good cause appearing **IT IS FURTHER ORDERED** that Defendants Dennis Campbell, New Mexico State Fair Commissioners, namely Travis Eden, Blake Curtis, D'Auna Wood, Connie Tsosie Gaussoin, Bill McIlhaney, Ned Sheperd, and Phil Harvey, Jr., the New Mexico State Fair Commission, and the New Mexico State Fair, and each of them, their agents, officers, servants, employees, and all other persons in active concert and participation with them are hereby permanently enjoined from enforcing the New Mexico State Fair rules and policies restricting, on the State Fairgrounds, the (1) "display [of] any form of political advertising," (2) "disseminat[ion of] political propaganda," (3) distribution of "collateral materials," and (4) making of "political endorsements and/or political statements...on Public Address systems and fair stages."

**IT IS SO ORDERED.**

**MARTHA VÁZQUEZ**
**U.S. DISTRICT COURT JUDGE**


Counsel for Plaintiffs
John W. Boyd
William S. Dixon
Edward Ricco
Phillip B. Davis

Counsel for Defendants
James P. Lyle
John H. Clough